**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JESSIE WILLIAMS,** | ) | |
| **ID # 1579579,** | ) | |
| **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:12-CV-4465-B (BH)** |
| | ) | |
| **WILLIAM STEPHENS, Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to Special Order 3-251, this case has been referred for findings, conclusions, and recommendation. Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

# I. BACKGROUND

Jessie Williams (Petitioner) challenges his conviction for capital murder in Cause F07-56054. The respondent is William Stephens, Director of TDCJ-CID (Respondent).

## A. Factual and Procedural History

On September 26, 2007, the State indicted Petitioner for the murder of Paul Martinez in the course of committing and attempting to commit the offense of robbery on or about August 17, 2007. (Clerk's Record ("C.R."):2-3). He pled not guilty and was tried before a jury in the 291st Judicial District Court of Dallas County on June 8-11, 2009. The state appellate court recounted the evidence at trial as follows:

> Appellant and the deceased were involved in opposite ends of a large scale drug deal that took place in a McDonald's parking lot. Appellant and his accomplice arrived at the parking lot in a Dodge Magnum, and appellant got out and went inside the McDonald's. After the deceased delivered to appellant's accomplice a large amount of cocaine, appellant re-entered the Dodge Magnum, the

deceased was shot, and the Magnum sped away. The deceased's partner in the drug deal was nearby and shot at the Magnum, hitting appellant. At the hospital, appellant admitted in his second written statement to police that he had shot the deceased in the back of the head and that he and the accomplice had agreed to steal the cocaine from the deceased.

The statement begins, "When I talked to Detective Thompson earlier, I lied because I was scared." Appellant admitted he was armed with a "black gun" during the shooting. Appellant stated that he and a man named "Mitch" had agreed to the plan earlier, so he knew that when "Mitch" called him on his cell phone inside the McDonald's, he was "to hurry out and jump in the car quick so he could back out, drop the [deceased] off around the corner and keep the money and dope." As "Mitch" backed out the car with the deceased and appellant inside, appellant said he heard gunfire, so he ducked. Then, appellant claimed, he shot the deceased "three times in the back of the head" before "everybody started shooting." Appellant said that he gave the gun back to "Mitch" when "Mitch" told him to and was dropped off near some apartments. He maintained "Mitch" told him to pay someone standing around at the apartments $100 to take him to the hospital. Appellant claimed that "Mitch" told him "if anything happens, tell the police that Dirty was in the car because the car belongs to Dirty."

Bill Jones, the senior nursing administrator at Parkland Hospital, testified at trial that when the officer wanted to speak with appellant before taking his second, incriminating statement, he prevented him from doing so until he examined appellant himself. Jones examined appellant to see if his mannerisms and speech were purposeful and appropriate and if he appeared to have a "clear head." Jones cleared appellant for talking with police, then remained in the room as appellant gave his statement. Jones testified that appellant appeared to understand what he was doing and indicated that he was giving the statement voluntarily. According to Jones, he asked appellant "on more than one occasion if he realized the implications of what he was doing, and he said he did." Jones noted that appellant received a total of six milligrams of morphine, given in two-milligram increments, in the hours that included his first and second statements to police. In Jones's opinion, that amount of morphine would not commonly cause side effects such as confusion or impaired thinking in a man of appellant's size. Jones did not see evidence of such side effects when appellant gave his second statement.

Several .40 caliber cartridge casings were found in the back right seat of the Magnum. There were two bullet holes in the front of the car's glove box. Police eventually were informed about a gun that had been found buried in the ground near where the Magnum had been abandoned. The gun was filled with some sort of epoxy, but after it was cleaned and test-fired, it was linked to the cartridge casings found in the car as well as the single bullet found in the deceased's brain.

DNA evidence in the case demonstrated that the deceased had been sitting in the front passenger seat of the Dodge Magnum and appellant had been sitting in the rear passenger seat. The deceased died from close-range bullet wounds to the back of his head. Police discovered stacks of what appeared to be bundles of money in a Wal Mart bag in the cargo area of the Magnum. The bills on the outside of the stacks amounted to approximately $1,000 cash, but the stacks consisted mainly of paper cut to the size of dollar bills.

Derrick Hall, known to his friends as "Dirty," testified that he and Kenji LeJay were friends who sometimes exchanged vehicles. On the day of the shooting, LeJay was driving Hall's Dodge Magnum, while Hall was driving LeJay's Cadillac Escalade. According to Hall, on the day of the shooting, LeJay called and told him to come pick him up because someone had tried to rob him. He picked up LeJay, then LeJay directed him to appellant, who was approximately three minutes away. Appellant was walking down a street with his shirt tied around his waist. When Hall got nearer to appellant, he could see appellant was bleeding. Appellant got into the Escalade, and Hall drove him to the hospital and dropped him off here. Hall testified that he was not paid for taking appellant to the hospital. He further testified that he was not present during the shooting.

When appellant first spoke to police at the hospital, he said that he had been robbed at an unnamed apartment complex. Once he learned the officer had a surveillance DVD of a shooting that had occurred in a McDonald's parking lot, he then admitted in his first written statement that he had lied. At the time of his first statement, appellant appeared to be calm "for just being shot." The officer taking the statement was unaware of whether appellant was medicated at the time of the statement. In it, appellant claimed that his friend "Mitch" contacted appellant at his home in Shreveport, Louisiana to test some drugs for him in Dallas. Appellant further claimed that Derrick Hall was present during the drug deal and that

appellant was shot through the car window while Hall and "Mitch" attempted to rob the deceased of the drugs at gunpoint. He stated, "I saw Dirty and Mitch shoot the [deceased]. I lied because I was scared." Appellant also claimed that after "Mitch" and Hall let him out of the car, he paid someone $100 to take him to the hospital.

John Ramos testified that the deceased was the father of his sister's child, and he thought of him as a brother. Ramos admitted that he and the deceased sold marijuana and cocaine together. He stated that Kenji LeJay had contacted the deceased to set up a deal the night before the deceased was shot. He and the deceased declined to take part in a drug deal at that time of night, so they agreed to meet with LeJay the next morning. That day, they met with appellant and LeJay at a house. They had three kilos of cocaine with them in a child's backpack. As they were parked behind the house, LeJay got into the back seat of their car and examined the cocaine. LeJay told the deceased to go inside the house to count the money (which was supposed to be $50,000, with another $5,500 to be paid later) while Ramos stayed out in the car. Ramos and the deceased discussed the situation in Spanish, then the deceased declined to make the deal. The men then parted ways.

Afterward, LeJay called again and agreed to do the deal at a location closer to Ramos and the deceased. He called the deceased and asked him to meet them at the McDonald's at Montfort Drive and Interstate 635. He specified that he wanted the deceased to come by himself because it made him nervous when Ramos spoke to the deceased in Spanish. The deceased and Ramos secretly agreed that the deceased would go to the location separately but Ramos would be nearby in a truck, ensuring the deceased was safe. They agreed to call each other on their cell phones and leave them on; the deceased would have his phone switched on in his pocket, and Ramos (with his phone on mute) would have his phone on speaker so he could hear what was happening during the drug deal. As the deceased parked at McDonald's, Ramos parked his truck in a nearby parking lot with the nose of the truck pointed toward McDonald's so he would have a view of the deceased.

The deceased told Ramos he was walking to the Dodge Magnum, the same car they had seen earlier that day. Ramos heard LeJay ask the deceased where Ramos was, and the deceased stated that he had left Ramos at home. Then Ramos heard shuffling, which he assumed was the drug exchange. Next, Ramos saw appellant approach the Magnum. As soon as appellant got into the back

passenger seat behind the deceased, Ramos heard the deceased screaming. He heard the deceased saying "please, please, and...begging." Then he heard a gunshot. Ramos dropped the phone, picked up his gun, and drove to the McDonald's. When Ramos got close enough to the Magnum to look inside it, he saw the deceased "leaned over" and unmoving in the front passenger seat. Ramos locked eyes with LeJay and fired his gun at him. As their car went by, he shot out the Magnum's back window. He did not fire after that because he was concerned he might hit the deceased. Afterward, he called 911 and told them a man in a green Dodge Magnum had kidnapped his brother. He chased the Magnum until he lost it around the intersection of the Dallas North Tollway and Interstate 635. Then he threw his gun out the window as he was driving down the tollway.

*Williams v. State*, 2011 WL 2163716, No. 05-09-00733-CR, slip op. at *1-3 (Tex. App.–Dallas, June 3, 2011, pet. ref'd). The jury found Petitioner guilty, and because the State did not seek the death penalty, the trial court automatically sentenced him to life in prison. (C.R.:40; R. 5:147-48).

On direct appeal, Petitioner alleged that the evidence was insufficient to support his conviction, and that the trial court erred in denying his motion to suppress his statements to the police. *Williams*, slip op. at *1-4. Petitioner's conviction was affirmed on direct appeal after the state court modified the judgment to reflect that he was sentenced to life in prison without parole. *Id*. at 1. Petitioner's petition for discretionary review (PDR) was refused on December 14, 2011. *See* PD-0892-11. He did not file a petition for writ of certiorari with the Supreme Court. Petitioner mailed his state habeas application on April 16, 2012, raising the same claims he raises in his federal petition, among others. (State Habeas Transcript "S.H.Tr." at 6-11). On June 27, 2012, the Court of Criminal Appeals denied the state writ without a written order on the findings of the trial court. *Id*. at cover.

Petitioner mailed his petition for federal habeas relief on October 26, 2012, along with a memorandum in support. (Pet. at10). Respondent filed a response on June 28, 2013, and provided

the state court records.  Petitioner filed his reply on July 29, 2013.

**B.      Substantive Claims**

Petitioner raises the following claims for relief:

–his confession was obtained illegally because he was not given *Miranda* warnings beforehand and because the police threatened his sister to procure the confession (ground one);

–his confession was not voluntary because it was given while he was medicated and in the hospital(ground two);

–the trial court erred in failing to give a jury charge that is required under Texas state law in all capital murder cases (ground three);

–his due process rights were violated when (1) the State committed prosecutorial misconduct by deliberating misstating the evidence during summation; and (2) the police failed to collect and preserve crime scene evidence that could have exonerated Petitioner (grounds four and five); and

–his trial counsel was ineffective when he failed to: (1) present testimony from Petitioner's sister, both at the hearing on the motion to suppress and at trial, regarding threats made to her by a police detective to coerce Petitioner to confess to the crime; and (2) present testimony at trial from an expert witness (ground six).

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions.  Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unrea-

sonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless

they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'"  *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## III.  MOTION TO SUPPRESS

In his first and second grounds for relief, Petitioner claims that the trial court erred in denying his motion to suppress because (1) he did not receive his *Miranda* warning prior to his second statement to the police, (2) the police threatened his sister, and (3) his second statement was involuntary due to his hospitalization and receipt of pain medication for a gunshot wound at the time.  (Pet. at 6).

Defense counsel filed a motion to suppress on March 27, 2009, asserting that any statements given by Petitioner to the police while in custody should be suppressed because he was under the influence of narcotics, and because his second statement was given under duress after the detectives threatened to arrest and incarcerate his sister. (C.R.:10-11).   The first trial judge assigned to hear the case held a hearing on the motion to suppress over two days, March 27, 2009, and May 8, 2009. He orally denied the motion at the conclusion of the hearing. (Supp. R.[3/27/09] at cover; Supp. R.[5/08/09] at cover, 56).  On June 11, 2009, Petitioner's case was transferred to another court.  That court held a second hearing on the motion to suppress, prior to the detective's testimony regarding Petitioner's statements.  It denied the motion and entered written findings of fact, concluding that Petitioner had been given his *Miranda* warnings and made his statements voluntarily.  (R. 5:9-28; C.R.:32-33).  It also instructed the jury that before Petitioner's statements could be considered as

evidence, the jurors must believe beyond a reasonable doubt that they were freely and voluntarily made. (C.R.:36-37). The state appellate court ruled that the trial court had not erred in denying the motion to suppress. *Williams*, slip op. at 3-4. This decision is not contrary to federal law.

## A.  Miranda warnings

Petitioner asserts in his first ground for relief that the second statement that he made to the police, in which he confessed to shooting the victim, should have been suppressed because he was not re-advised of his *Miranda* rights. (Mem. at 3-5).[1]

At the two-day hearing on the motion to suppress, Detective Dewayne Thompson testified that he visited Petitioner at Parkland Hospital to take a statement from him on the afternoon of August 17, 2007. He read Petitioner his *Miranda* rights as they were written on a *Miranda* card and had him sign the card. (Supp. R.[3/27/09]:29-32). Petitioner then gave a verbal statement that Thompson wrote down; he acknowledged being part of a drug deal in which he was going to be paid $10,000 to "test the dope." He admitted being in the car, but maintained that after he had been shot, he saw "Mitch" and "Dirty" shoot the "Mexican." (State's Ex. 122, 123). After Thompson wrote the statement, he read the entire four-page statement back to Petitioner, and both signed statement along with an independent witness who was present during the taking of the statement. (Supp. R.[3/27/09]:32). After further investigation, Thompson believed that Petitioner was not truthful in his first statement and returned to the hospital to speak to him. He took a second statement that was dated and signed on August 18 at 1:10 A.M. In his second statement, Petitioner admitted that he had lied in the earlier statement. He stated that only "Mitch" was originally in the car, that he went to

---

[1] Petitioner also asserts in his memorandum that because his statements were oral statements, state law required that they be recorded. (Mem. at 9). Notwithstanding that this claim was not raised at the state level and is therefore unexhausted, only Petitioner's written statements were entered into evidence, and not any additional oral statements.

the car after the "Mexican" entered the car with a black bag, that he sat behind the victim, and that he heard gunfire, got scared, and ducked. He then shot the victim three times in the back of the head. (State's Ex. 121).

At the second hearing on the motion to suppress, Thompson testified that he did not re-read the *Miranda* card to Petitioner when he returned approximately eight hours later to obtain a second statement from him because he did not have a second *Miranda* card. He did read Petitioner the *Miranda* warnings written at the top of the page where he wrote the statement, however. Petitioner signed at the bottom of both pages of the second statement, and he signed underneath the *Miranda* warnings at the top of both pages. The second statement was also signed by Thompson and a third-party witness on both pages. (R. 5:24-26; State's Ex. 121).

As recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Fifth Amendment's "prohibition against compelled self-incrimination require[s] that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The accused, however, may "validly waive his rights and respond to interrogation" after receiving his *Miranda* warnings. *Id.* at 484. *Miranda* "and its progeny in th[e United States Supreme] Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Dickerson v. United States*, 530 U.S. 428, 432 (2000).

The record before the trial court reflects that Thompson read Petitioner his *Miranda* rights, including the right to remain silent, the right to have an attorney present, the right to have an attorney appointed to represent him, the right to terminate the interview at any time, and the advisement that anything he said may be used against him, before taking both statements. (State's

10

Ex. 121, 122).  Petitioner never invoked these rights and instead waived them, electing to speak to the police detective in charge of the investigation and subsequently signing two written statements. Petitioner has not demonstrated that the state appellate court's denial of this claim was contrary to federal law.  His claim that his second written statement was taken illegally because he was not advised of his *Miranda* rights is therefore without merit and should be denied.

**B.**     <u>**Voluntariness of Statement**</u>

In his second ground for relief, Petitioner asserts that his statements to the police were involuntary because he had been given "mind altering" drugs, i.e., morphine, hydrocodone, and promethazine, for pain prior to making the statement.  (Mem. at 10-12).  He also claims, in his first ground for relief, that his statement was involuntary because the police officer who took his statement threatened his sister with criminal charges. (Mem. at 7).

During the first of the two-day hearing on the motion to suppress, Detective Thompson testified that he spoke to the medical staff about Petitioner's mental state, and that the attending nurse told him that Petitioner was not under any type of medication that would impair or hinder his ability to talk and make judgment calls.  He also testified that Petitioner appeared lucid at the time of both statements and gave appropriate answers to Thompson's questions. (Supp. R[3/27/09]:31, 33, 42, 47).  Thompson acknowledged speaking to Petitioner's sister at the hospital to gather information.  He denied telling her she was a suspect, threatening to handcuff her, speaking to any of Petitioner's family members about being suspects, telling Petitioner that one of his family members was a suspect, or threatening to arrest a family member.  Thompson also testified that he did not believe that any of the suspects in the murder were female.  *Id*. at 35-36.

On the second day of the two-day hearing, defense expert witness Dr. Alex Gilman testified

that he had reviewed Petitioner's medical records from the hospital at defense counsel's request. (Supp. R.[5/8/09]:5-6). The medical records reflect an order for four milligrams of morphine to be given to Petitioner at around 3:30 P.M. on August 17. *Id.* at 22-23, 27. Gilman testified that for the average weight male, the standard dose of morphine is ten milligrams every four hours, but doctors will often start with a lower dose. *Id.* at 25. He also testified that Petitioner received two milligrams of morphine at 9:00 P.M., two milligrams at midnight, and two milligrams at 2:00 A.M. *Id.* at 31. The peak for morphine is one hour, and it is out of a person's system within four hours. *Id.* at 27-8. Gilman also testified that while some people can have delusional side effects of morphine, its effect differs from person to person. *Id.* at 40-41. He could not state whether the morphine caused Petitioner's statement at 1:10 A.M. to be involuntary. *Id.* at 43-44.

Bill Jones, the nurse administrator at Parkland, testified that he witnessed Petitioner make the second statement to police. He signed the statement, along with Petitioner and Thompson. Before the statement, Jones spoke to Petitioner to make sure he was coherent, lucid and not under duress. He asked Petitioner if he knew what he was about to do, and whether the police had anything to do with him deciding to make the statement. Petitioner stated that he knew what he was doing. (Supp. R.[5/8/09]:47-49). After Petitioner made his statement and the police officer began to read it back, Jones asked Petitioner whether he realized the implications of making the statement, and Petitioner said that he did. *Id.* at 49-50. Jones did not believe that Petitioner was suffering from any delusions; he believed that Petitioner was able to make an independent, informed decision. *Id.* at 50. After the statement was taken and the police left the room, Jones against asked Petitioner whether anyone did anything to cause him to make the statement, and Petitioner said no. *Id.* at 55.

Both before and since *Miranda,* the Supreme Court has recognized that regardless of whether

a suspect is informed about and understands his Fifth Amendment rights, the totality of the circumstances surrounding a suspect's confession will render that confession involuntary in violation of the Fourteenth Amendment to the Constitution. *See Ashcraft v. Tennessee*, 322 U.S. 143, 145 (1944); *Haynes v. Washington*, 373 U.S. 503, 513-4 (1963) *Mincey v. Arizona*, 437 U.S. 385, 398 (1978). In *Ashcraft*, the Supreme Court ruled that a confession was involuntary where the suspect was questioned for thirty-six hours straight. 322 U.S. at 153-54. In *Haynes,* the Court found a written confession to be involuntary where it was signed after several days of detention, during which the suspect was told that he could not contact anyone until he cooperated, and before he was finally arrested and taken before a magistrate judge. 373 U.S. 513-14; *see also Davis v. North Carolina*, 384 U.S. 737 (1966) (confession was involuntary where suspect was not advised of his *Miranda* rights, held for sixteen days in a very small cell, not allowed to visit with any family members or use the telephone, given a limited diet, and interrogated daily). In *Mincey,* the Supreme Court held the admission of a confession obtained while the suspect was in the intensive care unit of a hospital with extensive pain from a gunshot wound, encumbered by tubes, needles, and a breathing apparatus, violated the suspect's due process rights because the statement was not voluntary. 437 U.S. at 398-402. The Supreme Court has also held that coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause of the Fourteenth Amendment. A confession cannot be deemed involuntary and thus inadmissible at trial under the Fourteenth Amendment based solely on the suspect's mental condition without evidence of coercive police conduct that is causally related to the confession. *Colorado v. Connelly*, 479 U.S. 157, 163-5 (1986).

The record shows no coercive police conduct on the part of Detective Thompson, or any

other officer, that would render Petitioner's two statements involuntary. Contrary to his assertion, he only received morphine in doses that were below what the defense expert considered normal dosage for Petitioner's size, and there was no evidence that Petitioner suffered mind-altering effects from this dosage. His second statement was coherent, related the facts in a cohesive manner, referred to the first statement, and was similar in parts to it. Finally, there was no evidence at the motion to suppress hearings that Petitioner was either suffering extensive pain or was overly encumbered by hospital equipment. The nurse administrator took steps to ensure that Petitioner understood what was happening and wanted to speak to the police. After speaking to the detective, the statement was read to Petitioner, and he read the statement himself and signed it. Petitioner's claim that his written statements were involuntary is without merit and should be denied.

## IV.  JURY CHARGE

In his third grounds for relief, Petitioner asserts that the trial court erred when it did not give a jury instruction required by Article 37.071 § 2(e)(2)(B) of the Texas Code of Criminal Procedure. (Mem. at 12-13). The state habeas court found that such an instruction was not required because it is only given to the jury at the punishment phase of cases in which the State seeks the death penalty. Because the State did not seek the death penalty in this case, it was the responsibility of the trial court to sentence Petitioner to life imprisonment without parole. (S.H.Tr.:86). The Court of Criminal Appeals denied this ground on its merits. This denial is not contrary to federal law.

This Court does not sit in judgment of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). Petitioner concedes that this charge is required at the punishment phase of capital murder trials. (Mem. at 12). There was no punishment phase of his trial because

his conviction for capital murder resulted in an automatic life sentence. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 1, 2(e)(2)(B) (West 2007). Petitioner's third ground for relief is without merit and should be denied.

## V. DUE PROCESS

In his fourth ground for relief, Petitioner asserts that his conviction was obtained as a result of prosecutorial misconduct based on a deliberate misstatement of the evidence during closing argument. In his fifth ground for relief, he asserts that his due process rights were violated because favorable evidence was not collected from the crime scene and preserved.

### A.     Closing Statement

In his fourth ground for relief, Petitioner asserts that the prosecutor committed misconduct when he argued during closing that gunshot residue was found on Petitioner's hands, when no residue was found there. (Mem. at 14-16). The state habeas court found that the prosecutor's statement did not, when viewed in light of the entire record, deny Petitioner a fair trial. (S.H.Tr.:86). This claim was then denied on its merits by the Court of Criminal Appeals. *Id.* at cover. This denial is not an unreasonable application of federal law.

The lead prosecutor made the erroneous statement during his closing statement that gun residue had been found on Petitioner's hands. Immediately after this statement was made, Petitioner's defense attorney objected to the misstatement of the evidence. (R. 5:119). The trial judge instructed the jury again that the statements made by counsel were not evidence, and that the only evidence it could consider came from the witness stand. *Id.* During his closing, defense counsel clarified that no gunshot residue was found on Petitioner's hands (R. 5:129).

"Prosecutorial misconduct implicates due process concerns." *Foy v. Donnelly*, 959 F.2d

1307, 1316 (5th Cir. 1992). Actions by a prosecutor may violate due process in two ways: "They may abridge a specific right conferred by the Bill of Rights, or may constitute a denial of due process generally, thus constituting a 'generic substantive due process' violation." *Id.* (quoting *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988)). Federal courts apply "a two-step analysis to charges of prosecutorial misconduct." *United States v. Duffaut*, 314 F.3d 203, 210 (5th Cir. 2002). The courts first decide whether the prosecutor's actions were improper and, if so, they then determine whether the actions "prejudiced the defendant's substantive rights." *Id.*

When a Petitioner asserts a generic due process violation, as here, and it is determined that the prosecutor's actions were improper, the Court asks whether the prosecutorial actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In the habeas context, the appropriate standard of review for such allegations is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly* 416 U.S. at 642). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted).

Petitioner has failed to demonstrate that the erroneous statement made by the prosecutor during closing statements rendered his trial fundamentally unfair. First, the statement was both objected to, and later corrected, by defense counsel. Second, in addition to Petitioner's confession to shooting the victim, there was substantial additional evidence presented regarding his guilt. A

video from the outside security camera at a Target store near where the shooting occurred showed the Dodge Magnum driving away from the scene, followed by a black truck. (R. 3: 39-41). John Ramos testified that he was the victim's partner in the drug deal and watched him enter the front seat of the Dodge Magnum. He heard what appeared to be the transaction between the victim and Lejay over the victim's speaker phone, saw Petitioner walk towards the back right of the car, immediately heard the victim begin to beg and scream, and then heard a gun shot. Ramos followed the Dodge Magnum in his truck and fired two gunshots towards Lejay, who was driving the Dodge, and then fired another shot at the back window, where he had seen Petitioner. (R. 5:78-85, 93, 104).

There was also testimony from the police officer who first questioned Petitioner about his gunshot wound. Petitioner first told him that he had been robbed in front of a washateria, but then made further statements that conflicted with this story. He later admitted that he was part of a drug deal that occurred in front of a McDonald's and nearby Target. There was testimony that Petitioner's fingerprint was found on the center console ashtray in the Dodge where the victim was shot. (R. 4:20, 30-35, 47). There was also testimony that the gun used to shoot and kill the victim was found filled with glue and buried in an alley, close to where the car had been abandoned, with two rounds remaining in the gun. (R. 4:70-71, 102-05, 164-74, 179-80, State's Ex. 117). The medical examiner testified that the victim was shot seven times at close range in the back of the head. (R. 4:82-88; State's Ex. 103). DNA evidence found on the center console, on the rear right passenger seat of the Dodge, and on the driveway where the Dodge with the victim's body in it had been abandoned, matched that from Petitioner. DNA from the victim's blood was found on Petitioner's shoes, socks, and clothing. (R. 4:128-49, 155; State's Ex. 115). Finally, there was testimony that most of the ejected shell casings were found in the back right passenger side of the

17

Dodge. (R. 3:118).

Given that the record reflects that the error was immediately objected to and later corrected, and that the State presented a substantial amount of evidence in support of petitioner's conviction, a misstatement of the evidence during closing statements did not violate Petitioner's due process rights. His fourth ground for relief is without merit and should be denied.

**B.    Failure to Preserve Evidence**

In his fifth ground, Petitioner asserts that his due process rights were violated because the police failed to conduct a trajectory rod test to determine the trajectory of the bullets that entered and exited the victim. He claims that the results would have exonerated him by showing that the bullets were shot from the left-hand side of the car. (Pet. at 7; Mem. at 16-18). The state habeas court found that the failure of the police to use trajectory rods to determine the trajectory of the bullets that were fired at the victim did not deprive Petitioner of a fair trial and therefore found that this claim was without merit. (S.H.Tr.:87). It was then denied on its merits by the Court of Criminal Appeals. *Id*. at cover. This denial is not an unreasonable application of federal law.

The crime scene detective who analyzed the car where the victim was found testified that he used trajectory rods to determine the trajectory of bullets based on some bullet holes found in the car. He did not use them for all bullet holes because the rods are longer than the distance between the glove box, where some bullet holes were located, to the back of the front seat. He also testified that he did not cut the rods because that would have been damaging city property, and he decided to work with the equipment he was provided. (R. 3:120, 124-25). He spent almost four hours processing and photographing the evidence in the car. (R. 3:126).

In *Arizona v. Youngblood*, 488 U.S. 51, 57 (1989), the Supreme Court held that:

The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

The Supreme Court went on to hold that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.

As in *Youngblood*, Petitioner asserts that his due process rights were violated because the police detective failed to conduct additional tests at the crime scene, the results of which might have exonerated him. He asserts, without any evidentiary support, that additional tests would have exonerated him, but he does not explain how trajectory rods could demonstrate that bullet holes in the glove box of a car made by bullets that exited the victim's body could have originated from the left-hand side of the car. Even if additional tests might have exonerated him, Petitioner has failed to allege or demonstrate bad faith on the part of the police. The detective testified that he used the trajectory rods when able to do so, and did not use them when they were too long. This is not evidence of bad faith such that Petitioner's due process rights were violated. His fifth ground for relief is without merit and should be denied.

## VI. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his sixth ground for relief, Petitioner claims that his trial counsel was ineffective for failing to call his sister as a witness at the hearing on the motion to suppress and at trial, and to call at trial an expert witness who testified at the suppression hearing. (Pet. at 7; Mem. at 19-26). The state habeas court found that Petitioner had not been prejudiced by the failure to call his sister as a witness at the suppression hearing because it would not have affected the outcome. It also found

that it was reasonable to assume that defense counsel, having obtained the services of an expert witness, determined that his testimony would not be favorable to Petitioner, and that he was not prejudiced by this decision. (S.H.Tr.:86). The Court of Criminal Appeals denied these claims on their merits. This was not an unreasonable application of federal law.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. art. VI. The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To successfully state a claim of ineffective assistance of counsel, the prisoner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his or her defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *See* 466 U.S. at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In determining whether counsel's performance is deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (inquiry focuses on whether counsel's deficient performance rendered the result of the

trial unreliable or the proceeding fundamentally unfair).  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent counsel's alleged errors.  *Strickland*, 466 U.S. at 695-96.

## A.  Failure to call Petitioner's Sister as Witness

At the state habeas level, Petitioner submitted a notarized statement from his sister, Joyvonda Williams, stating that she went to see him at the hospital.  When she walked towards the back of the emergency room, a police detective stopped her and told her she was going to jail because she was involved in a shooting that took place at a car wash.  She was frightened and crying as she told him that she was not involved in any shooting.  The detective then let her see her brother.  Ms. Williams states that she believes that the officer was wrong for threatening her, and she described the man as a "big black guy with gray hair."  The statement is not sworn.  (*See* doc. 3 at 64).

Complaints of uncalled witnesses are not favored in habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have stated are largely speculative.  *Day v. Quarterman*, 566 F3d 527, 538 (5th Cir. 2009).  To prevail on an ineffective assistance claim based on counsel's failure to call a witness, a petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.  *Day v. Quarterman*, 566 F3d at 538; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  Petitioner has failed to meet this burden.

Ms. Williams' unsworn statement does not state that she was available to testify at Petitioner's pretrial hearing and trial and would have done so, and it does not demonstrate that her testimony would have been favorable.  She does not state that she ever told Petitioner about any

perceived threat to her, and even her version of the alleged threat did not involve any attempt to coerce Petitioner to confess. Defense counsel clearly knew this information, as he asked Detective Thompson whether he threatened Petitioner's sister. The statement does not demonstrate that counsel was ineffective for failing to call the sister as a witness.

**B.** **Failure to call Expert as Witness**

Petitioner further asserts that his attorney was ineffective for failing to call the defense expert witness who testified at the suppression hearing at trial. Petitioner has failed to demonstrate any prejudice. Defense counsel sought, and was granted, the assistance of a medical expert to examine Petitioner's medical records. (C.R.:15-16). This expert, Dr. Alex Gilman, testified at the suppression hearing. (Supp. R.[5/8/09]:5-45). Dr. Gilman was not able to testify that Petitioner's confession was involuntary; he could only testify as to possible side effects of and normal reactions to morphine, as well as the typical dosages given for pain. Defense counsel cross-examined the nurse administrator about the medical records, morphine and its possible effects, and Petitioner's second statement. (R. 4:214-24, 227-30). Petitioner has not demonstrated that there is a reasonable probability that the result would have been different had he given this same testimony at trial. Petitioner's claims of ineffective assistance of counsel are without merit and should be denied.

## VII. EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary.

## VIII. RECOMMENDATION

The request for habeas corpus relief pursuant to 28 U.S.C. § 2254 should be **DENIED** with prejudice.

**SIGNED on this 18th day of April, 2014.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE